IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TIGER MINES NEW YORK, INC.,<br><br>                               Plaintiff,<br><br>     v.<br><br>TETHER HOLDINGS LIMITED,<br>TETHER OPERATIONS LIMITED,<br>TETHER LIMITED, and TETHER<br>INTERNATIONAL LIMITED,<br><br>                               Defendants. | Case No. 1:24-cv-5905<br><br>COMPLAINT<br><br>Jury Trial Demanded |

Plaintiff Tiger Mines New York, Inc. ("Plaintiff" or "Tiger Mines"), by and through its attorneys KEVIN KERVENG TUNG, P.C., for its Complaint against Defendants Tether Holdings Limited, Tether Operations Limited, Tether Limited, and Tether International Limited (collectively, "Tether" or "Defendants", and each a "Defendant") hereby alleges as below:

**STATEMENT OF THE CASE**

1.    Plaintiff Tiger Mines brings this action to seek relief for its digital wallets or accounts frozen by Tether.

2.    A cryptocurrency is a digital asset designed to work as a medium of exchange and/or a store of value. Cryptocurrencies leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

3.    Tether is the central authority over the cryptocurrency called "tether," or "USDT" — one of the world's first "stablecoins." While most cryptocurrencies are not backed by tangible assets, "stablecoins," such as USDT, aim to solve the volatility inherent in cryptocurrency by

1

pegging themselves to a tangible asset such as gold or fiat currency held in reserve. Unlike the underlying asset it represents, a stablecoin can be transferred between parties across borders instantaneously with minimal cost.

4.      On the official Tether platform (tether.to), Tether promises that "whether it is for personal use or business purposes, Tether tokens offer many benefits as the most stable, liquid and trusted stablecoin." In its words, "Tether tokens are among the most traded tokens in terms of daily volume, offering unequalled liquidity" and Tether provides "[f]ast transfers across the world without the worry of legacy banking delays."

5.      Contrary to what Tether has promised, it improperly and unreasonably froze the subject digital wallets (assigned to Tiger Mines in April 2024 from an individual Assignor) on the excuse of complying with a Chinese local police department request and prevented the wallets original owner or Tiger Mines from accessing the accounts or funds (worth about $160 Million dollars). The inability to access the wallets to sell, buy or trade cryptocurrency leads to severe financial loss. Making matters worse, Tether failed to timely respond to the Assignor or Tiger Mines's pleas for support and help, and Tether has been earning interest from the funds in the subject wallets.

6.      As a result of Tether's conduct, Plaintiff has been damaged through the loss of its wallet and account access, the funds and investments in those accounts and, among other things, its investment opportunities. Accordingly, Plaintiff seeks damages and equitable relief.

## **PARTIES**

7.      Plaintiff Tiger Mines is a corporation duly organized and existing under the laws of the State of New York and having its principal place of business located at 1080 Old Country Road #1054, Westbury, New York 11590.

8. Upon information and belief, Defendant Tether Holdings Limited is incorporated in, and a citizen of, the British Virgin Islands. It is the holding company of Defendants Tether Limited, Tether Operations Limited, and Tether International Limited.

9. Upon information and belief, Defendant Tether Operations Limited is incorporated in, and a citizen of, the British Virgin Islands ("BVI"). It is the entity that interfaces with Tether's U.S. customers that want to trade USDT.

10. Upon information and belief, Defendant Tether International Limited is incorporated in, and a citizen of, the British Virgin Islands. It is the entity that interfaces with Tether's non-U.S. customers that want to trade USDT.

11. Upon information and belief, Defendant Tether Limited is incorporated in, and a citizen of, Hong Kong. Tether Limited is the entity that issues USDT.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that this is a civil action between citizens of New York, citizens of British Virgin Islands and citizens of Hong Kong, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Venue lies within this District under 15 U.S.C. § 22, 18 U.S.C. § 1965, and 28 U.S.C. § 1391 because Defendants transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

14. This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal conducts, in the United States, including in this District. The damage was directed at,

3

and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

15. The Court also has quasi in-rem jurisdiction over the Defendants because Tether (USDT) is backed by US Dollars held in reserve and stored at Cantor Fitzgerald based in NY, and at other financial institutes or custodians.

## FACTUAL ALLEGATIONS

A. **Background**

16. Tether is a cryptocurrency stablecoin, launched by the company Tether Limited in 2014. As of January 2024, Tether's website lists fourteen protocols and blockchains on which Tether has been minted. It is the largest cryptocurrency in terms of trading volume, commanding 64% of the market share among stablecoins and having surpassed Bitcoin in 2019 to become the most traded cryptocurrency in the world.

17. Tether's beginnings trace back to July 2014, when a startup called Realcoin claimed it had produced the first stablecoin that would "be backed one-to-one by a fully auditable reserve of dollars." Realcoin was founded by investor Brock Pierce, its first CEO Reeve Collins, and software engineer Craig Sellars. According to Collins, by issuing realcoins they were "digitizing the dollar and giving that digital dollar access to the Bitcoin blockchain."

18. Collins stated that realcoins would "be introduced or removed from circulation depending on whether dollars are being added or redeemed." He also claimed that Realcoin had already found a "major banking partner," that it would "maintain a real-time record of its dollar-based reserves," and that its "lawyers [were] working to obtain U.S. money transmitter licenses from those states that require them."

19. In November 2014, Realcoin renamed itself Tether and rebranded realcoins as "tether" or USDT, the ticker under which the token is listed on cryptocurrency exchanges around the world.

20. One month later, on October 6, 2014, Tether issued its first batch of stablecoins, "printing" 100 USDT — allegedly equivalent to $100.

21. After the rebranding, Collins reiterated the Realcoin promise. He publicly asserted "that the number of [USDT] in circulation will always equate to the dollars in its bank account" and "that there are no pegs or formulas that complicate the process for its partners." He was unequivocal about the implications: "When you want to redeem them, we issue you cash."
On the official Tether platform (tether.to), Tether promises that "whether it is for personal use or business purposes, Tether tokens offer many benefits as the most stable, liquid and trusted stablecoin." In its words, "Tether tokens are among the most traded tokens in terms of daily volume, offering unequalled liquidity" and Tether provides "[f]ast transfers across the world without the worry of legacy banking delays."

22. Plaintiff reasonably believed that Tether would provide the most stable, liquid and trusted stablecoin it promised.

23. Plaintiff has been assigned from the Assignor (the name of whom is not disclosed here) the ownership of wallets (accounts) hosted by Tether that purportedly enable it to conduct transactions in cryptocurrency 24 hours a day, 7 days a week and 365 days a year. Each Tether customer's account and wallet reflects those transactions and permits access to their cash, crypto assets (e.g., cryptocurrencies) and other investment funds. Accordingly, Plaintiff is entitled to, reasonably expect, and must have access to its wallets at all times.

B. **The Illegal Freezing and Plaintiff's Transactions**

24. The Assignor purchased Tether from the crypto Huione Currency Exchange Hu on or about July 24, 2021, August 2, 2021, August 5, 2021 and August 10, 2021. After the purchase, Assignor received cryptocurrency through his two wallets 0x67aB29354a70732CDC97f372Be81d657ce8822cd and 0x661Be0562b31E9E8DdC2A7c93803005A1C71D749 (collectively, the "Wallets"). As of April, 2024 Assignor's Tether accounts had a total value of approximately $160,000,000.00, not including the accrued interest for almost three years.

25. On or about August 11, 2021, Tether notified the Assignor that his accounts were frozen because Tether received a request from a Chinese local police department to put the accounts on hold. Tether never showed Assignor or Plaintiff any documentation that it had the legal right or authority to freeze the Wallets. Instead, Tether directed Assignor to contact the Chinese police back in 2021 and again in 2024, when Plaintiff contacted Tether. Assignor and Plaintiff, through its own independent efforts and due diligence, discovered that there was a criminal judgment (the "Chinese Judgment") issued by the Chinese local government in December 2023 about an online gambling case regarding a random defendant unknown and unrelated to Assignor but the Wallets were mentioned in connection with the case. Plaintiff showed the Chinese Judgement to Tether's attorneys in July 2024 and again demanded Tether to release the wallet or show what authority it had to freeze the Wallets. It is worth noting that even though the Wallets were mentioned in connection with the case, the amount allegedly involved in the online gambling was only about ¥1,307,000.00 Chinese yuan (about $180,524.862 USD under an exchange rate of 7.24). Therefore, Tether had no right to froze Assignor's entire accounts worth about $160,000,000.00 USD.

26. Upon information and belief, Tether did not follow the proper procedures to freeze the assets in the subject wallets, because the freezing request was made by a Chinese authority due to a criminal matter and China has treaties[1] with foreign countries on international criminal judicial assistance, which provide that any request of seizing or freezing assets in a foreign country should go through particular procedures requiring exchange and file information between Chinese central authority and the foreign affairs liaison authority in the foreign country. Tether violated these procedural requirements by freezing the subject wallets based on a simple request from a Chinese local police department.

27. In April 2024, Plaintiff and Assignor signed a Tether Assignment Agreement (the "Agreement"), where Assignor assigns and transfers to Assignee, all of his right, title and interest in and to his Tether wallets and accounts, free and clear of all liens and encumbrances, and all rights and privileges under the Tether wallets and accounts, including but not limited to all rights of the Assignor to sue any third parties for any infringement or conversion of the Tether wallets and accounts. Assignee has the right to assert the property right in the Tether in the United States

---

[1] There is a Treaty Between the United Kingdom of Great Britain and Northern Ireland and the People's Republic of China on Mutual Legal Assistance in Criminal Matters. This treaty was started in July of 2022, when China has reached international treaties with 65 countries on criminal judicial assistance from foreign countries. China has concluded a similar treaty with the United States effective from Mar. 8 2001. The treaty comprises assistance on seizing and transferring evidence and articles. The treaty is silent on assisting in freezing bank accounts.

China does not have a treaty with, the British Virgin Islands ("BVI"), but China does have a criminal judicial assistance treaty with UK effective from the year 2016. Considering BVI is the overseas territory of UK, this treaty must apply to BVI. 28.   The scope of assistance covers, among others, (h)conducting inquiry, searches, freezing and seizures; (i)obtaining banking information; (j) assistance relating to proceeds from criminal activities and instrumentalities of crime.

Prior to this treaty, on Oct. 2018, China issued a law called The Law of the People's Republic of China on International Criminal Judicial Assistance.  Chapter 6 of the law provides in detail how to get a foreign country in assisting in criminal judicial actions. Article 39 in this chapter provides that where the case handling organ needs a foreign country's assistance in seizing, impounding or freezing the property involved in a case, it shall prepare a written request for criminal judicial assistance with the relevant materials attached, which shall, after being examined and approved by the competent authority to which it is subordinate, be filed by the foreign affairs liaison authority with the foreign country in a timely manner. Article 40 also provides in detail what content should be put in the requesting document and materials. Therefore, Chinese police should follow Sino-UK treaty and PRC Law on International Criminal Judicial Assistance to make the request and implement the action of freezing.

and to maintain any action to enforce the property right against others in its own name in the United States.

C. **Contact with Tether**

28. On or about January 13, 2024, Plaintiff, through its parent company Brookville LLC (a consulting firm), contacted Tether's attorneys Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") regarding the frozen Wallets. However, after the contact, Tether did not provide any substantive or adequate response and did not provide Plaintiff with access to its account or returned its funds.

29. On or about April 18, 2024, Plaintiff even sent a draft complaint of this case to Tether, attempting to negotiate a settlement on this matter.

30. Tether then sent its U.S. attorneys Kramer Levin to communicate with Plaintiff's undersigned attorneys.

31. On May 23, 2024, Plaintiff's representatives met in person with Tether's U.S. attorneys in Kramer Levin's New York office discussing a possible settlement of the matter.

32. Right after the draft complaint was sent to Tether for the purpose of negotiation, Plaintiff's representatives were contacted over the phone by a Chinese person called Duan allegedly representing Chinese government. Duan attempted to strike a deal with Plaintiff to open the frozen wallets at issue and proposed to split the money with Plaintiff. Duan claimed he knew the contents of the draft complaint sent from Plaintiff to Tether and provided certain key information in the draft complaint as proof of his knowledge. Duan's proposed deal was particularly dangerous and harmful to Plaintiff because it is an American company and payments made to a foreign government can be a violation of the Foreign Corrupt Practices Act (FCPA).

33. Also, after the May 23, 2024 meeting with Tether's attorneys in New York, Plaintiff's representatives received phone calls from another Chinese person called Zhang, who

also contended he represented Chinese government, asking to enforce the Chinese Judgment against the wallets and to split the remaining USDT with the Plaintiff. Zhang further claimed he knew Plaintiff's representatives had a meeting with Tether and its attorneys and said Chinese police department had issued additional instruction to Tether to keep the wallets frozen and he provided other information as proof that he indeed is working with the Chinese government.

34. Upon information and belief, Tether is actively working with the Chinese government or police department by providing updates and information that it received in this case to the Chinese government. In doing so, Tether breached the confidentiality of the settlement negotiations with Plaintiff.

35. Plaintiff remains locked out of its accounts and/or denied access to its accounts despite numerous attempts at contacting Defendants' attorneys and customer support.

36. On July 15, 2024, Tether's attorneys further advised that it was not Tether's intention to keep the subject wallets frozen "into the indefinite future based solely on the original Chinese law enforcement request." However, Tether's attorneys failed to give any clear deadline to release the subject wallets.

37. After much delay, on July 31, 2024, Tether's attorneys from Kramer Levin finally informed Plaintiff that it was giving the Chinese police until September 30, 2024 to commence a proceeding in the BVI to secure a proper order. This indicates that the original notice sent from the Chinese local police to Tether did not follow the proper procedures and did not provide sufficient justification for Tether to freeze the subject Wallets. Tether has no right to freeze Plaintiff's Wallets in the first place because it lacked the authority to do so.

38. As a result, Plaintiff has been damaged by the lack of access to its accounts, loss of funds, loss of cryptocurrency assets, deprived of the use of its funds and accounts preventing it

from engaging in any authorized transactions including but not limited to, investing, spending, saving, earning, using, selling or withdrawing its cryptocurrencies, and related injuries.

39. Defendants' actions have irreparably harmed Plaintiff and Plaintiff has no adequate remedy at law.

## COUNT ONE

## Breach of Fiduciary Duty

40. Plaintiff hereby realleges and incorporates by reference all prior allegations as though fully set forth herein.

41. As custodian of its funds and cryptocurrency assets, and acting as agent transacting on its behalf when it wishes to buy, sell or convert crypto assets on the Tether platform, Tether has a fiduciary relationship with Plaintiff, and must exercise the fiduciary duties it therefore owes with the utmost good faith, integrity, and in the best interest of Plaintiff.

42. As discussed herein, Tether represents that it will act as the custodian of all funds and digital currency assets it holds in its customer accounts, that Tether will securely store these funds and cryptocurrency assets, that Tether will hold these funds and cryptocurrency assets for the benefit of Plaintiff, that Tether will allow Plaintiff to control, access and withdraw its funds and cryptocurrency assets at any time, and that Tether will not sell, transfer, loan, hypothecate, interfere, or otherwise alienate customer cryptocurrency assets except as instructed by the customer.

43. As the custodian of its valuable assets, Plaintiff entrusted Tether to ensure the safekeeping of its assets and to provide it with access to and control over its accounts and the assets within those accounts when it wants.

44. Defendants owe a fiduciary duty to Plaintiff to provide it with immediate access to its accounts, the funds and cryptocurrency assets within those accounts.

45. Defendants owe a fiduciary duty to Plaintiff to protect its accounts, its transactions relating to those accounts, and its funds and cryptocurrency assets within those accounts.

46. Defendants owe a fiduciary duty to Plaintiff to timely respond to and resolve its complaints regarding freezing issues that preclude Plaintiff's access to its accounts, account transactions and account funds and cryptocurrency assets.

47. Defendants breached their fiduciary duty owed to Plaintiff to provide Plaintiff with immediate access to its accounts, the funds and cryptocurrency assets within those accounts.

48. Defendants breached their fiduciary duty owed to Plaintiff to protect its accounts, its transactions relating to those accounts, and its funds and cryptocurrency assets within those accounts.

49. Defendants breached their fiduciary duty owed to Plaintiff to timely respond to and resolve its complaints for almost three years regarding freezing issues that preclude Plaintiff's access to its accounts, account transactions and account funds and cryptocurrency assets.

50. Defendants breached their fiduciary duties owed to Plaintiff by, among other things, actively preventing Plaintiff from accessing its accounts, accessing the funds and cryptocurrency assets within those accounts, processing transactions within Plaintiff's accounts when not initiated by Plaintiff, locking Plaintiff out of its accounts, and/or refusing to return Plaintiff's funds to Plaintiff.

51. Defendants also breached their fiduciary duties owed to Plaintiff by failing to act with utmost good faith and in the best interests of Plaintiff by, among other things, ignoring or

failing to timely respond to and resolve Plaintiff's repeated complaints and other communications demanding access to its Tether accounts.

52. As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff has been damaged in an amount of at least $160,000,000.

53. In addition to actual or consequential damages, Plaintiff is entitled to pre-judgment interest, attorney's fees and costs, along with any relief that this Court deems just and proper.

## COUNT TWO

### Unjust Enrichment

54. Plaintiff hereby realleges and incorporates by reference all prior allegations as though fully set forth herein.

55. Plaintiff or its Assignor conferred a benefit upon Defendants by depositing its currency funds and cryptocurrency assets into its accounts maintained by Defendants and maintained such assets in those accounts, which enabled Defendants to profit from the investment and trading of such assets.

56. Plaintiff or its Assignor conferred a benefit upon Defendants by paying fees to Defendants in order to conduct transactions in its accounts, maintain its accounts and have access to those accounts.

57. Plaintiff or its Assignor further conferred a benefit upon Defendants by allowing Defendants to earn interest from the assets in the accounts.

58. As a result of Defendants' actions and omissions alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff. Under principles of equity and good conscience, Defendants should not be permitted to retain the assets held within Plaintiff's accounts.

59.     Plaintiff is entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon all fee revenue, income, profits, interest and other benefits obtained by Defendants at the expense of Plaintiff resulting from Defendants' actions and/or omissions alleged herein, all in an amount of at least $160,000,000. Plaintiff is also entitled to attorney's fees, costs and prejudgment interest, along with any relief that this Court deems just and proper.

## COUNT THREE

### Conversion

60.     Plaintiff hereby realleges and incorporates by reference all prior allegations as though fully set forth herein.

61.     Plaintiff has the right to possess the assets in the subject wallets/accounts.

62.     Defendants have asserted, and improperly maintain, dominion and control over Plaintiff's accounts, account funds and cryptocurrency assets by preventing Plaintiff to access its accounts and take possession of its account funds and cryptocurrency assets.

63.     Defendants have allowed Plaintiff's funds and cryptocurrency assets to be frozen and Defendants have benefited thereby by improperly freezing and retaining such funds and cryptocurrency assets that have taken Plaintiff's funds and cryptocurrency assets without its authorization.

64.     Defendants have benefited by generating interest from the assets frozen by Defendants.

65.     Plaintiff is entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon all fee revenue, income, profits, interest, and other benefits obtained by Defendants at the expense of Plaintiff resulting from Defendants' actions and/or omissions alleged

herein, all in an amount of at least $160,000,000. Plaintiff is also entitled to attorney's fees, costs and prejudgment interest, along with any relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for relief as follows:

A. Defendants immediately shall provide Plaintiff with access to its accounts and account transaction information.

B. Defendants immediately shall provide Plaintiff with access to its funds and cryptocurrency assets in its accounts.

C. Defendants immediately shall return to Plaintiff all funds and cryptocurrency assets in its accounts prior to being locked out of those accounts.

D. Defendants immediately shall return to Plaintiff all funds and cryptocurrency assets wrongfully taken from its accounts.

E. A judgment for actual damages and compensatory damages in the amount of at least $160,000,000.

F. A judgment for disgorgement of interest, income and other profits.

G. A judgment for all such other and further relief as the Court may deem just and proper, together with the costs and disbursements that Plaintiff has incurred in connection with this action.

Dated: Queens, New York
August 2, 2024

                                          KEVIN KERVENG TUNG, P.C.
                                          *Attorneys for Plaintiff*

                                          /s/*Kevin K. Tung*
                                          By: Kevin K. Tung, Esq.
                                          Queens Crossing Business Center
                                          136-20 38th Avenue, Suite 3D
                                          Flushing, NY 11354
                                          (718) 939-4633